Mary E. Stauber, Appellee, v. Leo Stauber, Appellant.

Gen. No. 5596.

1. APPEALS AND ERRORS—*effect of appeal as distinguished from writ of error.* An appeal does not search the entire record as does a writ of error. An appeal simply causes the court to determine the propriety of the particular order appealed from.

2. DIVORCE—*when order granting alimony not reduced.* Unless it is apparent that the court has committed error in determining the amount of alimony to be paid, an appellate court will not disturb the award made.

Divorce. Appeal from the Circuit Court of La Salle county; the Hon. EDGAR ELDREDGE, Judge, presiding. Heard in this court at the October term, 1911. Affirmed. Opinion filed March 13, 1912.

McDOUGALL & CHAPMAN, for appellant.

LUCEY & LARKIN and BOYS, OSBORN & GRIGGS, for appellee.

MR. PRESIDING JUSTICE DIBELL delivered the opinion of the court.

On May 13, 1910, Mary E. Stauber filed a second bill against her husband, Leo Stauber, for a divorce and for the custody of their children, and for support, and for an accounting as to her property in the hands of her husband. The bill charged many instances of great brutality by the husband against his wife, and drunkenness for more than two years, and set up the property rights of the parties. On June 21, 1910, she obtained an order that her husband pay her $1,200 for the support of herself and her children during the pendency of the suit and for solicitor's fees. On December 3, 1910, there was a hearing and a decree of divorce and certain findings as to the property, and she was given the care, control and education of the four children of the marriage, all girls, the oldest of whom was born in 1903 and the youngest in 1909, and she was given the household goods, and the husband was required to pay the complainant $2,000 per year, commencing December 10, 1910, and payable quarterly in advance, till the further order of the court. A certificate of the evidence at that hearing was prepared and filed. There were further proceedings to enforce payment of alimony. Thereafter, on April 10, 1911, Stauber filed a petition in said cause for the reduction of said alimony. Said petition was heard on April 17, 1911, and was denied and no certificate of evidence was taken showing upon what proofs the court acted. An appeal was on that day

prayed and allowed from that order. On May 8, appellant moved to set aside the order for an appeal and the order denying appellant's petition. That motion was heard on May 22, 1911. The court set aside the order allowing an appeal and heard proofs upon appellant's motion to set aside the order of April 17, denying the petition to reduce alimony, and thereupon refused to set aside said order of April 17, and appellant again prayed an appeal from the order of April 17 and that appeal was granted and appellant complied therewith by giving a bond. A certificate of evidence was filed, setting forth the evidence heard on May 22, 1911. The appeal is only from the order of April 17, and the appeal bond so recites. It must be assumed that the proofs heard on April 17, or the showing then made, justified the action of the court in then denying the petition to reduce alimony. The proofs heard on May 22 cannot be used to show that the court was not justified in its order of April 17. Numerous affidavits, introduced by appellant on May 22, were sworn to after April 17. An appeal does not search the whole record, as does a writ of error. The question on this appeal is only whether the court was justified in entering the order of April 17, when that order was entered, and, as the proofs then heard are not preserved, this condition of the record would require an affirmance of the order. But, as a writ of error could hereafter be sued out, which would involve the correctness of the decision of the court on May 22, we have concluded to consider the case upon its merits, as if the evidence heard on May 22 had been heard on April 17. There are assignments of error which question the propriety of the decree of December 3, 1910, in allowing $2,000 per year as alimony, but no appeal was prosecuted from that decree, and, as this is not a writ of error, the propriety of that decree is not before us.

At the hearing on May 22, 1911, it was agreed that

the pleadings and the evidence previously taken on
other hearings be considered in evidence on that hear-
ing, and said pleadings and evidence were read, to-
gether with various affidavits, and there was also oral
testimony, and the court refused to set aside the order
of April 17. The claim of appellant is that before
this bill was filed, he conveyed to his wife property
worth about $240,000; that she is in receipt of a large
income therefrom and could receive much more there-
from by proper effort, while he is worth but $15,000
and owes $2,500 to a company of which his brothers
appear to be the owners; that this property brings him
only 5% per annum; that he earns only $75 per month
when able to work, and has had a long and expensive
illness when he earned nothing. If these are the facts
and all the facts, the allowance ought to be reduced.

The parties were married April 17, 1901, at Streator.
They lived all their married life in a rented house in
Streator. After the marriage appellee received from
the estate of her father, John Kangley, deceased,
checks for various sums amounting in all to $29,259.94
and 115½ shares of the capital stock of the Star Coal
Company of the par value of $100 per share, or a total
from her father's estate of over $40,000. She en-
dorsed each of these checks and certificates of stock
and delivered them to her husband. She testified
that she delivered them to him for safekeeping and
care for her and for investment in her name. He
deposited these checks to his own account in banks.
He received seven dividends upon this capital stock
and appropriated them to his own use and then sur-
rendered the certificates and took out new certificates
in his own name. With $18,000 of appellee's money
appellant purchased a farm of 160 acres in La Salle
county and took the deed to himself. When appellee
learned that he had taken the deed to himself, she
complained and insisted that the title should go to
her. He yielded and conveyed the land to her, and

afterwards persuaded her to convey the land back to him. In August, 1909, she filed a bill against him for divorce. He induced her to dismiss that bill and resume marital relations with him. One of the considerations which induced her to abandon that suit was that he re-conveyed to her this farm of 160 acres. Before doing so, however, he secretly leased the farm for a year from the following March and took a note from the tenant for the rent, and he afterwards collected that note. She received none of the rent of that farm during the time that they lived together as husband and wife. Real estate rose in value after this was purchased, and there was evidence tending to show that it is now worth $32,000. Appellant introduced evidence tending to show that there is supposed to be a vein of coal seven feet thick underlying this land, and that if such is the fact, and if said coal is of a quality fit for mining, the coal underneath the surface is worth another $32,000; and appellant in his sworn petition stated that, if this land is underlaid by said vein of coal, as he believes, then the fair cash value of that coal is $200,000. Appellee introduced evidence tending to show that no tests have been made upon this land to ascertain whether there is coal underneath the land, nor the character of the coal, if any; that mining to any great extent in the vicinity of this land has been abandoned; and that it would cost $100,000 to open up a coal mine on this farm. Appellant treats the case as if the increased value of the land and the value of this coal, if it has any, is to be considered as something which he has given to his wife. In fact, this land was all bought with her money, and if there has been any rise in value, it is a natural increase which she owns, and, in conveying it back to her, he only conveyed to her that which was hers. It is also obvious that she has no money with which to open a coal mine thereon, and it is proven that coal mining in that vicinity, except in a

small way, has been abandoned. With some of appellee's money and with a part of the certificate of capital stock he bought a farm of 80 acres in Livingston county, and afterwards sold the same and with part of the proceeds bought real estate in the town of Enid, Oklahoma. He conveyed this to his wife, and claims it is worth $8,000. The proof shows that there is great depression in the value of real estate in Enid; that this property is not worth over $5,000, and would bring very much less at a forced sale, and would not bring more than the taxes and the special assessments now a lien upon the land; and that it rents for much less than the annual taxes and annual installments of special assessments thereon. It will therefore be seen that appellant has conveyed back to appellee much less than he received from her, and that he has also had all the income of her property during all their married life, while she only had her support.

Appellant testified that when he was married he was worth about $6,000 in horses and cash. He was not able to give any good account of this. The horses appear to have been possessed and used by his father and the alleged money to have been loaned around between his father and his brothers with some of whom he lived, and without any notes given therefor. We think it exceedingly doubtful from the evidence if at the time of his marriage he had any property which could have been found by an officer with an execution. He testifies that he now has about $15,000 in securities and that he owes $2,500 to Stauber Brothers Automobile Company. He testified that these securities were in a safety deposit box in a bank at Clinton, Iowa, the key of which box he had left in Iowa. He was unable to tell the name of the bank, but he did produce proof by an officer of a bank in Iowa that he had opened a safety box owned by appellant and found therein such securities. Two young women testified that about April, 1910, appel-

lant showed them a bank book from some bank in Chicago, showing a deposit in appellant's name of either $56,000 or $76,000 and that he then told them that he received $8 per day from his deposits in that bank. Appellant testified that he had no such bank book showing such a deposit in any bank in Chicago, but he admitted that he showed them a deposit slip with a Chicago bank, showing $8 interest for that month, and that he told them that he got that much every day, and that he was joking when he said this. Appellee introduced in evidence a book kept by appellant in his own hand, wherein were entered as his property mortgages maturing later than this divorce and some of them not yet matured, the principal of which amounted to $48,188. Appellant introduced evidence tending to show that he had sold and assigned these mortgages. Appellee introduced in evidence a letter from appellant, written since this divorce was granted, in an effort to procure a reconciliation, in which he stated that he had made over $1,000 the previous week in a legitimate business and that he intended to be in a legitimate business the rest of his days. This reference to a legitimate business alluded to the fact that one of his employments had been that of a gambler. Appellant could not deny making this statement as the letter in his own handwriting was in evidence, but he testified that this was a lie which he told to his wife in order to induce her to be reconciled to him. A witness testified that some three years before this hearing appellant told him that he personally owned a large tract of land in Iowa and was negotiating a sale of the same, and that, if he sold it, he would have $20,000 to loan on real estate; that appellant did not afterwards loan $20,000 so far as the witness knew, and that the witness understood that the reason was because the sale of the Iowa land was not consummated. Appellant denied using this language, and gave an entirely different version of the conversation.

Defendant's conduct after this suit was begun is worthy of consideration. Shortly after the bill was filed he was served with an injunction thereunder, enjoining him among other things, from withdrawing from any bank any money he had deposited therein. Three days after this injunction was served upon him he went to a bank in Chicago, where he then had on deposit $17,925 of appellee's money, and withdrew from said bank $17,850 by obtaining a draft payable to the order of a fictitious person. He then left the state of Illinois, went to Iowa, endorsed said draft in the name of said fictitious person to his own order, and got the draft cashed by a bank in Iowa, and remained in Iowa, and gave small checks by which he withdrew the rest of the money in the Chicago bank. Contempt proceedings were begun against him for this disobedience of the injunction and also for his failure to pay $1,200 temporary alimony and solicitor's fees, under the order of June 21, 1910, but appellant did not come within this state so that the attachment could be served upon him. Thereafter, at the instance of his wife, he was indicted in La Salle county for embezzlement and was extradited to this state; and was then tried and adjudged guilty of contempt in this cause and was ordered committed to the county jail for one year or until the further order of the court. On April 1, 1911, appellee filed a petition in which she represented that appellant had paid none of the alimony provided in the decree of December 3, 1910, and that he had no real or personal property within the jurisdiction of the court, which could stand as security for the payment of said alimony, and she asked that appellant be required to give a bond with sureties to secure the payment of said alimony. An order to that effect was entered. Appellant paid the $1,200 and paid $1,000 of the permanent alimony and gave the bond required in the sum of $10,000 and was discharged from the contempt proceedings, and seems

to have been afterwards discharged from imprisonment under the charge of embezzlement. In other words, appellant paid none of the temporary or permanent alimony except under the pressure of contempt proceedings, and has paid nothing which this bond was given to secure, and the object of this present petition is to avoid the liability which he assumed when he gave that bond, and to release his security thereon.

The order fixing the alimony at $2,000 per year, payable quarterly till the further order of the court, was in effect requiring appellant to return to appellee the rest of her property which he had misappropriated to his own use. We think it is just that he should return at least the principal of all that property. If he has only $12,000 or $15,000 this is really her property and he ought to return it. His account of his manner of life during the continuance of the marriage relation does not indicate to us that he earned any considerable amount himself, or received any considerable amount except as the income from his wife's property. When he has returned the principal of what he received, very likely this allowance for alimony should be materially reduced, if his own account of his present financial condition is true. When we find that he has apparently represented his financial condition entirely differently to various other persons, we cannot feel sure that his testimony in court on that subject is reliable. We are of opinion that the alimony ought not to be reduced till appellee has been repaid the principal of her estate.

The order is therefore affirmed.

*Affirmed.*